IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| PR GROUP, LLC, et al., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14-0401-CV-W-BP |
| ) | |
| WINDMILL INTERNATIONAL, LTD and ) | |
| DOUGLAS COMBS, ) | |
| ) | |
| Defendants. ) | |

**ORDER AND OPINION GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAYING CASE PENDING COMPLETION OF ARBITRATION**

Pending is Defendant's Motion to Compel Arbitration. The Court has considered the parties' arguments and as outlined below concludes the motion, (Doc. 9), should be granted, and the case should be stayed pending completion of the arbitration.

**I. BACKGROUND**

Plaintiff PR Group, LLC (an entity formed by Plaintiffs Jerry Rellihan and Tom Pernice, Jr.) originally initiated this action in Missouri state court in December 2011, but directed that service be withheld. As a result, Defendants were never served, but they nonetheless removed the case to federal court in May 2014. The Court remanded the case, ruling that Defendants waived their right to seek removal because they had asked the state court to dismiss the case for lack of prosecution before removing it to federal court. (Doc. 17.) Defendants appealed, and the Court of Appeals reversed the remand order. *PR Group, LLC v. Windmill Int'l, Ltd.*, 792 F.3d 1025 (8th Cir. 2015). While the case was on appeal PR Group obtained approval from the state court to file an Amended Petition that added more plaintiffs and claims. After the Eighth Circuit

issued its Mandate Plaintiffs were permitted to file an Amended Complaint in this Court, and the Amended Complaint, (Doc. 44), stands as their operative pleading in this case.

As a general matter, Plaintiffs' claims arise from an Investment Framework Agreement ("IFA") agreement between PR Group and Defendant Windmill International, Ltd. ("Windmill") whereby Windmill agreed to locate investment opportunities in Central and Eastern Europe and present them to PR Group for consideration. Plaintiffs allege Defendants "held themselves out as [individuals] with high-level government access and connections in Central and Eastern Europe." (Doc. 44, ¶ 13.) Defendants further represented "that there was a very limited time in which Plaintiffs could invest a sum of $1.5 Million in exchange for a $4 Million return on said investment," (Doc. 44, ¶ 22, *see also* Doc. 44, ¶ 21), and discouraged Plaintiff from consulting with their financial advisors. (Doc. 44, ¶ 109.) In May 2006, PR Group and Windmill "entered into an 'Investment Framework Agreement,' wherein it was agreed that [Windmill] would bring investment opportunities to [PR Group] so that there could be an 'evaluation' of whether there was a desire to pursue the investment opportunity." (Doc. 44, ¶ 24.)[1] PR Group transferred $1.5 million to Windmill,[2] and seven months later "Plaintiffs received a document . . . which outlined two commercial and real estate development projects wherein an 'investment update' was provided establishing that [PR Group] had contributed $1.5 Million in exchange for $3.5 Million in second tier equity in said real estate projects." (Doc. 44, ¶ 32.) The two real estate projects were in Bulgaria. (Doc. 44, ¶ 33.) In January 2008, Defendants represented that the investment

---

[1] The Investment Framework Agreement is attached as an exhibit to the Petition originally filed in state court. (Doc. 1-1.)

[2] Jerry Rellihan and Pernice, the two owners of PR Group, apparently agreed to split the investment equally. Jerry Rellihan raised his half of the $1.5 million by taking out a loan secured by property owned by Plaintiff T.L.B.R. Group, LLC, an LLC owned jointly by him and his wife, Plaintiff Kerrie Rellihan. (Doc. 44, ¶¶ 28-29, 31, 42.) T.L.B.R. Group and Kerrie Rellihan are not parties to the Agreement, and Kerrie Rellihan is not an owner of PR Group. Nonetheless, and despite the Amended Complaint's use of the general term "Plaintiffs" to imply communications between Kerri Rellihan and Defendants, the Court does not address whether Kerrie Rellihan or T.L.B.R. Group have any viable claims.

2

had doubled, but in reality it had not. (Doc. 44, ¶¶ 34-35.) In October 2010, Plaintiffs learned that PR Group "actually owned one parcel of land and not two large parcels as detailed in the [documents] provided by Defendants to Plaintiffs in January of 2007." (Doc. 44, ¶ 37.) Plaintiffs have not received a return on the investment. (Doc. 44, ¶ 41.)

Count I alleges Defendants breached the IFA "by failing to fulfill their promise of $3.5 Million in second tier equity in the commercial and residential real estate development projects." (Doc. 44, ¶ 52.) Count II asserts a claim of fraud, contending that Defendants made fraudulent representations to induce PR Group to enter the IFA. Count III also asserts a claim for fraud, alleging "Defendants made false representations . . . concerning the status of the . . . investment with Defendant Windmill." (Doc. 44, ¶ 72.) Count IV alleges Defendants "concealed material facts that they had a duty to disclose" including the fact that they were "being investigated and sued for fraud . . . while at the same time soliciting $1.5 Million from Plaintiffs." (Doc. 44, ¶ 91.) Count IV is also predicated on Defendants' failure to reveal correct information about the status of PR Group's investment. (Doc. 44, ¶ 100.) Count V is captioned "Fraudulent Inducement" and is really a combination of Counts II and III. Count VI is a claim for unjust enrichment. Count VII essentially alleges Defendants were negligent in all of the respects set forth in the previous counts. Finally, Count VIII asserts a claim for negligent misrepresentation for failing to provide information "regarding the status of the . . . investment in the commercial and residential real estate development project," (Doc. 44, ¶ 140; *see also* Doc. 44, ¶¶ 143, 147), and supplying false information about the investment. (Doc. 44, ¶¶ 145-46, 148.)

Section 9.7.1 of the IFA (1) states that the law of England and Wales governs the IFA and (2) provides that any disputes will be submitted to arbitration. Specifically, the relevant portion of Section 9.7.1 states as follows:

3

> The Framework agreement shall be construed in accordance with the laws of England and Wales. Any controversy or claim arising out of or relating to this IFA shall be settled by arbitration. In the event that any claim is made by PRG, such arbitration shall be conducted in London, in accordance with the rules of the Arbitration Society in London.

(Doc. 1-1, § 9.7.1.) Defendants ask the Court to enforce the parties' agreement to arbitrate and stay the case until the arbitration is completed. Plaintiffs argue that the agreement to arbitrate is unenforceable because of Defendants' alleged fraud and because the provision is unconscionable. Plaintiffs alternatively contend Defendants have waived the right to enforce the arbitration provision. As discussed below, the Court does not agree with Plaintiffs.

## II.  DISCUSSION

### A.  The Arbitration Agreement's Validity

The Court begins by discussing Defendants' contention that the arbitration provision is governed by the Federal Arbitration Act ("FAA"). Plaintiffs do not contest this point – but neither do they concede it. The issue justifies discussion because if the FAA applies it guides the Court's analysis.

The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid . . . and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The phrase "involving commerce" is "the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. . . . [I]t is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce' . . . ." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274 (1995) ("[T]his Court has previously

4

described the [FAA's] reach expansively as coinciding with that of the Commerce Clause."). Defendants contend (and Plaintiffs do not seriously dispute) that the IFA affects interstate commerce. It is a contract between limited liability companies operating in different states, and the subject matter involves investments in Europe. These facets alone demonstrate that the arbitration agreement "involves commerce" and the FAA therefore applies. *See Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 790-91 (8th Cir. 1998) (agreement involved interstate commerce because parties were located in different states and "the agreement contemplates the transfer of inventory and money between the states.").

Having concluded that the FAA applies to the parties' agreement to arbitrate, the Court's role is limited to "determin[ing] simply whether the parties have entered a valid agreement to arbitrate and, if so, whether the existing dispute falls under the coverage of the agreement." *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir. 2001). The parties do not dispute that the Amended Complaint's claims fall under the agreement's ambit, so the sole question for the Court is whether the agreement is valid. "Because arbitration is a matter of contract, whether an arbitration provision is valid is a matter of state contract law, and an arbitration provision may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Torres v. Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015) (quotations omitted). Plaintiffs contend the arbitration agreement is invalid because its terms are unconscionable, and Defendants argue to the contrary.

At the outset, the Court notes that the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), controls the analysis of unconscionability. Plaintiffs cite Missouri cases predating *Concepcion* that consider the issue in terms of "procedural

5

unconscionability" and "substantive unconscionability," (Doc. 30, p. 11 (citing *Manfredi v. Blue Cross & Blue Shield of Kansas City*, 340 S.W.3d 126 (Mo. Ct. App. 2011)), and rely on this analytical framework. However, after *Concepcion*, the Missouri Supreme Court altered its analysis when considering whether an arbitration provision is unconscionable.

> While Missouri courts traditionally have discussed unconscionability under the lens of *procedural* unconscionability and *substantive* unconscionability, *Concepcion* instead dictates a review that limits the discussion to whether state law defenses such as unconscionability impact the *formation* of a contract. . . . Future decisions by Missouri's courts addressing unconscionability likewise shall limit review of unconscionability to the context of its relevance to contract formation.

*Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 492 n.3 (Mo. 2012) (en banc) (internal citations omitted); *see also Torres v. Simpatico, Inc.*, 781 F.3d 963, 968-69 (8th Cir. 2015). Nonetheless,

> the *Brewer* court also noted that 'the purpose of the unconscionability doctrine is to guard against one-sided contracts, oppression [,] and unfair surprise,' which may 'occur during the bargaining process' or when a later dispute reveals 'the objectively unreasonable terms.' [*Brewer,* 364 S.W.3d] at 492–93. Thus, courts may be called upon to 'consider whether the terms of an arbitration agreement are unduly harsh,' that is, 'whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party or ... reflect an overall imbalance in the rights and obligations imposed by the contract at issue.' *Id.* at 489 n. 1. In either event, the court reasoned, 'it is at formation that a party is required to agree to the objectively unreasonable terms.'

*Torres*, 781 F.3d at 969 (first alteration in original). Factors to be considered include whether the arbitration agreement was non-negotiable, whether the arbitration agreement's terms are clear or confusing, whether one party or the other was in a superior bargaining position, whether the arbitration agreement is one-sided, and whether the arbitration agreement is structured in a way to make arbitration cost-prohibitive. *Brewer*, 364 S.W.3d at 493-94

Finally, the "target" of the alleged unconscionability must be the agreement to arbitrate specifically, not the contract as a whole.

6

> [W]hen parties commit to arbitrate contractual disputes, it is a mainstay of the Act's substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first instance, not by a federal or state court. For these purposes, an arbitration provision is severable from the remainder of the contract, and its validity is subject to initial court determination; but the validity of the remainder of the contract (if the arbitration provision is valid) is for the arbitrator to decide.

*Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 503 (2012) (quotations and citations omitted); *see also Buckeye Check Casing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *Ellis v. JF Enterprises, LLC*, 2016 WL 143281 (Mo. 2016) (en banc). Thus, Plaintiffs cannot avoid the effect of the arbitration provision by attacking the IFA generally or by attacking provisions other than the arbitration agreement. Plaintiffs must demonstrate that the arbitration agreement itself is invalid.

With these principles in mind, the Court can consider Plaintiffs' contentions that the arbitration agreement is unconscionable. First, Plaintiffs emphasize that the IFA does not comply with the Missouri Uniform Arbitration Act, which requires specific language in a specific form advising the parties that a contract contains an arbitration provision. *See* Mo. Rev. Stat. § 435.460. However, Missouri courts have held that the statute's requirements do not apply to an arbitration provision governed by the FAA. *E.g.*, *Kagan v. Master Home Products Ltd.*, 193 S.W.3d 401, 407 (Mo. Ct. App. 2006) (citing *Bunge Corp. v. Perryville Feed & Produce, Inc.*, 685 S.W.2d 837, 838-39 (Mo. 1985) (en banc)); *see also Kohner Properties, Inc. v. SPCP Group VI, LLC*, 408 S.W.3d 336, 345 n.4 (Mo. Ct. App. 2013); *International Bhd. of Elec. Workers v. Hope Elec. Co.*, 380 F.3d 1084, 1103 (8th Cir. 2004). The FAA governs, so the IFA's failure to comply with Missouri's statutes regarding arbitration provisions is of no consequence.

7

Plaintiffs next contend that the agreement is unconscionable because "Defendants represented that a significant investment . . . was required in a short time period and inundated Plaintiff[s] with a mountain of ultimately erroneous information, all of which purportedly had to be evaluated in a narrow time frame for the investment to be possible." (Doc. 30, p. 11.) However, they offer no further analysis (or cite any case law) to suggest that this fact makes an agreement unconscionable. (Doc. 30, pp. 11-12.) The subject matter of the contract did not involve a necessity, Plaintiffs were not faced with dire consequences if they did not enter the IFA, and there is no allegation that "high-pressure" tactics were used. *See Cicle v. Chase Bank USA*, 583 F.3d 549, 555 (8th Cir. 2009) ("[T]here is no evidence that Chase engaged in 'high-pressure sales tactics to coerce' Cicle into entering into the Cardmember Agreement.").[3]

Plaintiffs next present arguments resting on a combination of (1) the choice of law provision, (2) the directive that the arbitration be performed "in accordance with the rules of the Arbitration Society in London," and (3) the directive that the arbitration occur in London. They first argue that the choice of law provision is unenforceable, but even if this is so the argument has no effect on the agreement to arbitrate because it is a separate component of the IFA; the arbitration provision's validity does not depend on the substantive law governing Plaintiffs' claims.

Plaintiffs further contend that the provision is unconscionable because the "Arbitration Society in London" does not exist. Defendants contend this is a reference to the London Court

---

[3] The Court's independent research unearthed few cases discussing how a party's time to consider a contract affects the analysis. Those few cases arose in decidedly different contexts, but they suggest that the critical question is whether the party had enough time to *understand* the agreement, not how much time the party had to decide *whether* to enter the agreement. *See Potts v. Potts*, 303 S.W.3d 177, 189 (Mo. Ct. App. 2010) (citing *In re Marriage of Thomas*, 199 S.W.3d 847, 858 (Mo. Ct. App. 2006)); *Miles v. Werle*, 977 S.W.2d 297, 302 (Mo. Ct. App. 1998). Plaintiffs do not contend they had insufficient time to understand the agreement; they contend they had insufficient time to investigate it as fully as they would have liked. This does not constitute unconscionability under Missouri law.

8

of International Arbitration ("the LCIA"). The Court does not agree with Defendants that the IFA identifies the LCIA as the intended arbitration body just because the LCIA is the top result when the phrase "Arbitration Society in London" is put into an internet search engine. (Doc. 37, pp. 7-8.) However, the failure to properly specify an arbitrator does not render the agreement to arbitrate ineffective. If the agreement does not include a method for naming an arbitrator, or "if for any other reason there shall be a lapse in the naming of an arbitrator . . . then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators . . . ." 9 U.S.C. § 5. This provision applies when the arbitral party designated ceases to exist as well as when one has not been designated. *E.g., Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (applying provision when arbitral body designated by parties no longer existed). Given that the FAA provides a mechanism for naming an arbitrator when the parties have failed to do so, the Court cannot conclude that the parties' failure to effectively name an arbitrator means the agreement is unconscionable.

Finally, Plaintiffs contend the arbitration provision is unconscionable because arbitrating in London is expensive. Anticipating that the Court might utilize its powers under the FAA to designate the LCIA as the arbitral body, Plaintiffs allege "that registration is $1,750[;] other administrative fees are hourly and range from $250 to $150 per hour . . . and don't include the fees and expenses for the members of the arbitration panel which . . . are capped at $450 per member, except for unusual circumstances." (Doc. 45, p. 4.) They also argue that "[t]hese costs are added to airfare for any witnesses, experts, and parties to the city named the most expensive to stay in all of Europe." (*Id.*) Plaintiffs support these assertions with (1) LCIA's Schedule of Costs and (2) a February 2015 article in the *Daily Mail* that reports London is the most expensive city in Europe to visit.

9

The effect of these arguments is lessened because of the parties' designation of a non-existent arbitral body. As discussed below, the Court will exercise its power to direct that arbitration be conducted by the American Arbitration Association. This may still result in the arbitration taking place in London, but even if this is what the AAA decides Plaintiff's contentions (and the supporting material) are insufficient to demonstrate the arbitration agreement is unconscionable. Plaintiffs bear the burden of demonstrating that arbitration will "be prohibitively expensive, and that it is likely, as opposed to merely speculative, that the prohibitive costs will actually be incurred." *Torres*, 781 F.3d at 969; *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000). This means they must "present specific evidence of likely arbitrators' fees and evidence of their own financial inability to pay those fees so that the court can determine whether the arbitral forum is accessible. If this burden is not met, the district court must honor the arbitration agreement and compel arbitration." *Torres,* 781 F.3d at 969 (quotations and internal citations omitted). In *Torres,* the plaintiffs presented more detailed information than Plaintiffs have presented here: in addition to the schedule of filing fees and the rates charged by arbitrators, the plaintiffs in *Torres* presented an affidavit estimating the length of arbitration, the average loss suffered by the plaintiffs, and a comparison of that loss to the likely recovery in an effort to demonstrate that the arbitration provision – including its bar on classwide arbitration – made arbitration economically unfeasible. *Id.* Plaintiffs' information does not indicate what the total cost would likely be to arbitrate this matter in London or, significantly, how that cost compares to the likely total cost for litigating in a judicial forum. Without this information the Court cannot hold the arbitration agreement "costs too much" to be conscionable. Moreover, Plaintiffs have not addressed their ability to pay the costs. They have generally averred they have suffered "financial devastation" and that T.L.B.R. Group was

10

required to relinquish the property it used to secure Jerry Rellihan's portion of PR Group's investment. (*E.g.*, Doc. 45, p. 5.) However, they have not established their inability to fund an arbitration proceeding – or, more precisely, their inability to fund any cost associated with arbitration that is over and above the cost associated with litigation.[4]

Finally, Plaintiffs contend the arbitration provision is barred by fraud. It is not clear whether Plaintiffs intend this argument to be part of the unconscionability analysis or present it as a free-standing argument. Either way, the argument fails. As discussed earlier, the arbitration agreement cannot be invalidated based on arguments targeting the contract generally, and this principle applies particularly with respect to claims of fraud. The defense of fraud can defeat the arbitration agreement only "if the claim is fraud in the inducement of the arbitration clause itself – an issue which goes to the making of the agreement to arbitrate . . . . But where the clam was one of fraud in the inducement of the contract generally, *Prima Paint* [*Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)] declared that the issue was for the arbitrator." *Koch v. Compucredit Corp.*, 543 F.3d 460, 464 (8th Cir. 2008) (quotation omitted). Plaintiffs insist that the fraud claim asserted in Count V defeats the arbitration provision. (Doc. 30, p. 18; Doc. 45, p. 6.) However, Count V generally alleges Plaintiffs were fraudulently induced to enter an agreement containing an arbitration provision and not that the fraud was specific to the arbitration provision. As Plaintiffs' fraud claim addresses the inducement to enter the contract

---

[4] Plaintiffs also attach significance to the fact that the IFA does not specify where (or by whom) claims asserted by Windmill will be arbitrated. (Doc. 30, pp. 14-15.) However, it is clear that the parties agreed any claims asserted by Windmill must be arbitrated so the agreement treats the parties equally in that respect. Moreover, the provision is effectively silent with regard to the arbitral body for both sides' claims because (as explained earlier) the designation of the "Arbitration Society in London" is a nullity. As to inequities regarding the location of the arbitration, the Court's designation of the AAA means Plaintiff's claims may or may not be arbitrated in London. Similarly, given that a court called upon to enforce the arbitration provision against Windmill would utilize its power under 9 U.S.C. § 5 to designate an arbitral body, claims by Windmill might or might not be arbitrated in London. Thus, the IFA's failure to include specific details regarding arbitration of claims asserted by Windmill does not reflect the imbalance of terms necessary to justify invalidating the arbitration provision.

and not the arbitration clause, under *Prima Paint* and cases interpreting it the issue of fraud is for the arbitrator to decide and not for the Court.

### B. Waiver

Plaintiffs alternatively contend that Defendants waived their right to enforce the arbitration agreement by (1) sending a letter to Plaintiffs' counsel in May 2012 indicating a plan to remove the case to federal court, (2) failing to move for arbitration while the case was pending in state court and instead filing a motion to dismiss for lack of prosecution, (3) removing the case to federal court, and (4) opposing Plaintiffs' Motion to Remand. The Court concludes that none of these events constitute a waiver.

Courts "routinely apply a tripartite test to determine whether a party has waived its right to arbitration. We find waiver when the party (1) knew of its existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by its inconsistent actions." *Hooper v. Advance Am., Cash Advance Centers of Mo., Inc.*, 589 F.3d 917, 920 (8th Cir. 2009) (quotations omitted). "A party acts inconsistently with its right to arbitrate if the party substantially invokes the litigation machinery before asserting its arbitration right." *Lewallen v. Green Tree Servicing, L.L.C.*, 487 F.3d 1085, 1090 (8th Cir. 2007) (quotation and alterations omitted). Prejudice occurs when the parties litigate "substantial issues on the merits, or when compelling arbitration would require a duplication of efforts." *Hooper*, 589 F.3d at 923 (quotation omitted). There is little doubt that Defendants knew they had a right to arbitrate disputes related to and arising from the IFA, but the remaining two requirements have not been satisfied.

This case started when PRG group filed suit in December 2011. The Petition was never served, and in May 2012 Defendants' counsel sent a letter inquiring whether Plaintiffs intended

12

to serve the suit and indicating that if they did Defendants would "retain local counsel, and remove the matter into Federal Court and proceed to litigate the case there."  (Doc. 30-2, p. 2.)  This letter indicates the author is not making litigation decisions about the case, but rather that other attorneys will be retained to do so.  More importantly, the letter does not invoke "litigation machinery" or otherwise purport to eschew Defendants' right to enforce the arbitration provision once the case was removed to federal court.  Asking the state court to dismiss the case for lack of prosecution also did not demonstrate a commitment to having the state court resolve Plaintiffs' claims; the Eighth Circuit held as much when it remanded the case, holding "[b]ecause [the motion] neither addressed the merits . . . nor sought an adjudication on the merits, the motion did not clearly and unequivocally demonstrate any willingness on Windmill's part to litigate in state court."  *PR Group*, 792 F.3d at 1026.  Similarly, removing the case to federal court and opposing Plaintiffs' Motion to Remand is of no consequence.  These actions indicate a preference for a particular tribunal to resolve the issues attendant to the issue of arbitration, not a preference for a particular tribunal to resolve Plaintiffs' claims.

Finally, even if these events could be construed as invoking "litigation machinery" to resolve the case, none of them prejudiced Plaintiffs in the manner required by *Hooper*.  Defendants have not asked any Court to consider the merits of Plaintiffs' substantive claims, and no effort expended here will be duplicated in the arbitration.  For these reasons, the Court concludes Defendants have not waived their right to enforce the arbitration agreement because they have not acted inconsistently with that right and Plaintiffs have not been prejudiced in the manner required to support a waiver.

13

### C. Designation of the American Arbitration Association

As previously discussed, the parties have designated an entity that does not exist to conduct the arbitration. Therefore, pursuant to 9 U.S.C. § 5, the Court must designate the arbitration process to be employed. The Court directs that the arbitration proceeding be initiated with the American Arbitration Association. Once that is done, the AAA will determine whether this is an "international matter" or a "U.S. Matter," based on the criteria set forth in Article 1 of the arbitration rules established by the United Nations Commission on International Trade Law ("UNCITRAL.")[5] This will allow the parties to present competing arguments as to whether this matter should be arbitrated in London (in which case AAA may direct that the arbitration be conducted by the International Centre for Dispute Resolution) or the United States, as well as arguments regarding whether the laws of England and Wales should apply to the IFA.

### III. CONCLUSION

For the reasons set forth above, the Motion to Compel Arbitration, (Doc. 9), is **GRANTED.** Pursuant to 9 U.S.C. § 5, the Court **ORDERS** that the arbitration be commenced with the American Arbitration Association. This case is **STAYED** pending completion of the arbitration. 9 U.S.C. § 3.

The parties are **ORDERED** to file Joint Status Reports setting forth the progress made towards resolution of this matter. The first Joint Status Report shall be due by the earlier of (1)

---

[5] This information can be gleaned by accessing the AAA's website.
https://www.adr.org/aaa/faces/s/contact?_afrLoop=134924196570955&_afrWindowMode=0&_afrWindowId=xe1khdm42_1#%40%3F_afrWindowId%3Dxe1khdm42_1%26_afrLoop%3D134924196570955%26_afrWindowMode%3D0%26_adf.ctrl-state%3D1dr0lfpzj1_4 (last visited January 29, 2016.)

commencement of the arbitration or (2) May 2, 2016; subsequent Joint Status Reports shall be filed every ninety days thereafter.

**IT IS SO ORDERED.**

DATE: February 1, 2016

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
UNITED STATES DISTRICT COURT